CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

JUL 0 3 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MARK J. HUNSBERGER | ) | |
| and | ) | Case No. 7:07CV00087 |
| CHERYL A. HUNSBERGER, | ) | |
| Plaintiffs, | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| v. | ) | By: Samuel G. Wilson |
| | ) | United States District Judge |
| J.A. WOOD | ) | |
| and | ) | |
| WILLIAM W. BLESSARD, | ) | |
| Defendants. | ) | |
| | ) | |

This is an action for damages by plaintiffs Mark and Cheryl Hunsberger against

defendants William W. Blessard and Botetourt County, Virginia Deputy Sheriff J.A. Wood

arising out of their warrantless entry into the Hunsbergers' home. Plaintiffs assert three claims: a

Fourth Amendment claim, pursuant to 42 U.S.C. § 1983; an unreasonable search and seizure

claim, pursuant to Virginia Code § 19.2-59, against Wood only; and a trespass claim, pursuant to

Virginia law. The matter is before the court on cross-motions for summary judgment. The

Hunsbergers maintain that defendants' warrantless entry into their home violated the Fourth

Amendment and state law. Wood maintains that his entry into the Hunsbergers' home was

reasonable under the Fourth Amendment and permissible under state law because he entered

pursuant to the "caretaker" and "emergency" doctrines and that, in any event, he transgressed no

bright constitutional line and is entitled to qualified immunity as to the Hunsbergers' § 1983

claim. Blessard maintains that he was not a state actor subject to liability under § 1983, that he is

not liable under § 1983 because he acted in good faith, and that he is not liable for punitive

damages as to the trespass claim. The court finds that, in the light most favorable to the

Hunsbergers, there was not an apparent emergency justifying Wood's warrantless entry into the Hunsbergers' home under the emergency or caretaker doctrines. The court denies the Hunsbergers' and Wood's cross-motions for summary judgment. However, the court also finds that, even in the light most favorable to the Hunsbergers, Blessard entered their home in good faith and is not subject to liability under § 1983. Accordingly, the court will grant Blessard's motion for summary judgment on that claim. Previously, the court held that Blessard is not subject to liability under § 19.2-59 as a matter of law and therefore dismissed that claim. This leaves only a purely state law trespass claim against Blessard. Although the court is constrained to deny Blessard's motion for summary judgment as to this claim, it finds that he is not liable for punitive damages as to the trespass claim.

## I

For the purposes of resolving Wood's and Blessard's motions for summary judgment the court recites these facts in the light most favorable to the Hunsbergers.

Just after ten o'clock on the night of February 2, 2007, Sergeant J.A. Wood and Deputy Jody Edwards of the Botetourt County Sheriff's Office received a call from the dispatcher reporting a call from Charlene Klik, a neighbor of Mark and Cheryl Hunsberger, complaining of cars coming and going from the Hunsbergers' house, kids being dropped off, and loud noise. Wood understood that Klik did not know if the homeowners or parents were home and that Klik did not know what was going on, but that Klik believed that noise from the house was upsetting her dogs and that the cars parked at the house did not belong there. (Wood Dep. 92.) The officers parked outside of the house where they found two cars parked alongside the road in front of the house, the house lights on, no noise, and nothing at the scene that substantiated Klik's

2

complaint of noise or suspicious activity. The two officers left approximately five minutes after arriving.

Two hours later, after midnight, the officers returned to the house because Klik had called again reporting further activity and noise. Edwards went to speak with Klik who repeated her complaint and stated that she was worried about the homeowners being gone. Again, Wood observed that the lights in the Hunsbergers' house were on but he heard no noise. Wood observed a young man enter the garage from the house, turn the garage light on, then shortly after, return to the house, turning the garage light off again. Wood also observed three cars parked alongside the road in front of the house, two cars parked with two tires on the grass but one parked with its rear end farther out in the road than the other cars. The only difference at the scene from Wood's previous visit was one additional car parked outside the house.

When Edwards returned from talking with Klik, Wood told Edwards that they would go up to the house, "talk to the folks that are there, [and] get them to move the cars off of the street." (Wood Dep. 100.) Wood also said they would ask them to keep the noise down although he had still not heard any noise. (Wood Dep. 100.) Wood and Edwards pulled their cars into the Hunsbergers' driveway and up to the corner of the house. At that point, the lights in the house went out.

Wood approached the front door of the house while Edwards stood behind him in the front yard. Wood rang the doorbell a few times and waited a minute or so. When no one answered the door, Wood rang the bell continuously, twenty-five or thirty times. (Wood Dep.

3

107, Matthew Deane Dep. 37, AW[1] Dep. 87.) Wood and Edwards turned and began to walk to their cars when Wood noticed that the walk-in door on the side of the garage, which had been closed when the officers approached minutes before, was now open. Wood entered the garage and surveyed it with his flashlight, saw nothing out of the ordinary and exited. Wood then walked around to the back of the house to make sure that no one was hiding there. Wood observed two vehicles parked behind the garage and a trashbag containing beer cans in the yard.

Wood contacted the dispatcher to run a check on the license plates of the cars parked at the house. He learned that the two cars parked behind the garage belonged to the Hunsbergers. (Wood Dep. 113.) Wood asked the dispatcher to call the owners of any cars that did not belong to the homeowners and connect those calls to his cell phone. Wood spoke with Teresa Cooper and Jennifer Deane, two mothers of teenage boys who were at the house, as well as William Blessard, the stepfather of a teenage girl who was at the house. Wood informed the parents that their vehicles were at the house and parked in the road "a little bit" and asked if they could come and pick up their vehicles. (911 Tr. 15.) Wood informed Cooper that her son was "going to either be drunk or drinking" (911 Tr. 16) and told Deane "I can't get anybody to answer this door. I don't know what's going on here other than I'm pretty sure that everybody in there's going to have had something to drink and their [sic] probably not old enough if I'm right." (911 Tr. 24.)

Blessard arrived at the house before the other parents and Wood informed Blessard that he had received two noise complaints, that he did not think that the parents were home, that he

---

[1]Most of the parties' filings use initials to conceal the names of minors. The court follows suit here.

4

did not know if it was a teenage party or not, and that he was still investigating. Blessard told Wood that his stepdaughter was supposed to be staying with a friend, not at the Hunsbergers' house, but that her car was parked out front and she was not answering her cell phone. While Blessard and the officers were outside the house, two other cars pulled up to the house, people exited those cars and drove off in the cars parked in front of the house. Neither officer stopped anyone who arrived or left in order to ask if those people might clarify the situation.

Wood suggested that he and Blessard approach the house together to see if Blessard could get someone to come to the door so that they could find his step-daughter. As they approached the house, Wood and Blessard heard a noise in the garage. Wood and Blessard entered the garage through the walk-in door and heard the sound of one or more persons going down into the basement from the garage, then shutting and locking the door. Blessard went down the stairwell and knocked on the locked door, calling for his stepdaughter. Blessard knocked hard enough to loosen the door from the jamb slightly but he received no answer and returned to the garage.

Wood informed Edwards by radio that there was a "second unsecured door" (Wood. Dep. 137) leading into the house but did not use his radio to call for backup or contact deputy Edwards further, even though Wood's radio was switched on during the entire search of the house. Wood entered the main floor of the house through the door from the garage and announced himself. Blessard accompanied Wood either beside or just behind Wood. Wood did not tell Blessard to stay back or exit the house while he searched. In fact, the two men said nothing to one another as they entered the main floor.

The two men surveyed the main floor of the house using Wood's flashlight. They saw no one and heard nothing. Wood and Blessard then proceeded downstairs to a basement area

5

(apparently separate from the basement area where Blessard had knocked earlier) where they saw a bar on which sat a beer carton, a few empty beer cans, and a half-full bottle of vodka. The television in that room was on, and the screen was blue as if someone had just turned off a video game. (Blessard Dep. 96-97.)

Wood and Blessard then went back to the main floor of the house, surveyed the rooms again, then went through a hallway and up the stairs to the second floor. Upstairs, Wood entered a bedroom and determined that it was empty while Blessard stood near the doorway. Wood then entered a second bedroom where a dog walked out of a closet. Wood opened the closet and found the Hunsbergers' sixteen-year old son, seated in the closet wearing only his boxer shorts. Wood asked him "where everyone else was" and the boy replied by asking "they're not here?" (Wood Dep. 160.) The boy then stood up and walked past Wood and Blessard, who asked him nothing more in order to clarify what was happening, and he walked downstairs and neither Wood nor Blessard saw him again.

Wood and Blessard then entered a third bedroom where they could see that someone was asleep in the bed whose hair was visible above the covers. Wood pulled the covers down to see who was in the bed and revealed the Hunsbergers' ten-year-old daughter. Wood asked Blessard if this was his stepdaughter and Blessard replied that it was not. At that point, the girl in the bed screamed loudly enough for her father to hear in his bedroom further down the hall. (Mark Hunsberger Dep. 33.) Wood and Blessard exited the girl's room and approached the last bedroom when Mark Hunsburger exited that room (the Hunsbergers' bedroom) in a bathrobe and confronted Wood and Blessard. Mr. Hunsberger asked what was going on. Wood answered, "this man is looking for his daughter." Mr. Hunsberger responded "let's go downstairs," and the

6

three men went downstairs into the kitchen.

In the kitchen, Mr. Hunsberger continued to ask what was going on. Blessard did not speak. Wood replied that he was looking for Blessard's daughter and that her car was parked in front of the house. Mr. Hunsberger replied that kids often meet up and drop off cars, that he had never seen Blessard's daughter before, and that he had no idea whether she was in his house. Wood then informed Mr. Hunsberger that he had found beer in the basement. (Mark Hunsberger Dep. 36.)

Mrs. Hunsberger, who was upset that her daughter awoke to two men in her room, then came down to the kitchen. Seeing his wife upset, Mr. Hunsberger became upset as well and told Mrs. Hunsberger to call the police and repeatedly told Wood and Blessard to leave the house. Wood and Blessard left through the garage approximately ten minutes after Mr. Hunsberger discovered them in his house. Wood and Blessard were in the house for between thirty and forty-five minutes in total.

After Wood and Blessard left, Mr. Hunsberger called the Botetourt County Sheriff's office to file a complaint against Wood. Lieutenant Blessard (no relation to defendant William Blessard) came to the house and made a report of the Hunsbergers' complaint.

## II

### Claims Against Wood

*A. The § 1983 Claim*

Wood maintains that his warrantless entry into the Hunsbergers' home was lawful under the emergency and community caretaker doctrines and that, even if it were not, he is entitled to

7

qualified immunity. At this juncture, on Wood's and Blessard's motions for summary judgment, when the court is required to resolve all disputed facts in favor of the Hunsbergers, the court concludes that Wood has failed to demonstrate either that the exceptions to the warrant requirement upon which he relies apply or that he is entitled to qualified immunity. Accordingly, the court denies Wood's motion for summary judgment.

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [government] conduct." Saucier v. Katz, 533 U.S. 194, 205 (2001). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

When a government official properly asserts qualified immunity, the threshold question that a court must answer is whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. Saucier, 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" – that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201, 202. With these precepts in mind, the court turns to the question of whether, in the light most favorable to the

8

Hunsbergers, Wood's warrantless entry violated the Fourth Amendment.

The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Those exceptions are circumscribed most closely or narrowly when a home is the subject of the intrusion. It is there that the purposes and protections of the Fourth Amendment are at their zenith. United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). "[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." United States v. Karo, 468 U.S. 705, 714 (1984); see also Payton v. New York, 445 U.S. 573 (1980) ("The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . ."). Therefore, a search inside a home without a warrant is "presumptively unreasonable." Payton 445 U.S. at 586. It follows that suspicion, no matter how strong or reasonable, cannot overcome the presumption. Rather, to overcome the presumption the proponent must demonstrate that his warrantless entry falls within an exception to the warrant requirement. Here, Wood contends that his entry was lawful under the emergency and community caretaker doctrines. Accordingly, the court turns to those doctrines.

The courts have recognized:

9

that police may enter premises without warrants for such emergency purposes as aiding in fire-fighting, giving first aid to people in distress, protecting persons or property from threatened harm, and the like. The circumstances under which warrantless entries for such purposes can be made are exactly comparable to those which justify warrantless entries under the more commonly encountered 'exigencies.' Indeed, they are also frequently referred to as 'exigent circumstances.' This particular exigency is expressed as one of reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions. To invoke this so-called 'emergency doctrine,' the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.

United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992).

In Cady v. Dombrowski, 413 U.S. 433 (1973), the Supreme Court first described police officers' non-law-enforcement functions as "community caretaking functions" in a case involving the warrantless search of an automobile. It noted that "local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as "community caretaking" functions, totally divorced from detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441. The "community caretaker" doctrine has since emerged as a recognized exception to the warrant requirement. The community caretaker doctrine frequently intersects the emergency doctrine but its intellectual underpinning differs. Although an emergency may supply the occasion for a police officer to exercise his "community caretaker" functions or responsibilities, that is not necessarily the case. For example, in South Dakota v. Oppermann, 428 U.S. 364 (1976), the Supreme Court determined that the routine police practice of securing and inventorying impounded vehicles as a "community caretaking"

10

function is reasonable under the Fourth Amendment despite the absence of an emergency or even

probable cause. But in sanctioning the practice, the court noted that it drew a sharp dividing line

between automobiles and homes or offices:

> This Court has traditionally drawn a distinction between automobiles and homes
> or offices in relation to the Fourth Amendment. Although automobiles are
> "effects" and thus within the reach of the Fourth Amendment, warrantless
> examinations of automobiles have been upheld in circumstances in which a search
> of a home or office would not . . . . Cady v. Dombrowski, 413 U.S. at 433, 439-
> 40.

Oppermann, 428 U.S. at 367. In the present case, Wood cites Cady v. Dombrowski as support

for application of the "community caretaker" doctrine to support his warrantless entry. However,

in Opperman the Supreme Court cites that very case and two others as examples of "warrantless

examinations of automobiles [being] upheld in circumstances in which a search of a home or

office would not." This does not mean that the "community caretaker" doctrine has no

application to the warrantless entry of a home. Indeed, numerous state and federal courts have so

applied it. See, e.g., United States v. Stafford, 416 F.3d 1068 (9th Cir. 2005) (applying

community caretaker principles and Dombrowski to entry of residence, and finding that report of

a dead body justified warrantless entry); United States v. McGough, 412 F.3d 1232, 1239 (11th

Cir. 2005) (assuming arguendo that community caretaking applied to warrantless entry of home,

and finding no exigent circumstances to justify entry); United States v. Meixner, 128 F. Supp. 2d

1070 (E.D. Mich. 2001) (applying community caretaker principles to entry of residence, and

finding that suspicion of a domestic dispute did not justify warrantless entry); State v. Smith, 97

P.3d 567, 571 (Mont. 2004) (applying community caretaker principles to entry to an apartment

bathroom, and finding that circumstances did not show need of immediate assistance, so entry

was not justified). Rather, it reiterates something that the Fourth Circuit and other courts have

11

made clear: the doctrine applies to homes only when the caretaking function is coupled with an emergency sufficient to satisfy the emergency doctrine. "[A]ny person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within," Moss, 963 F.2d at 678, and if the officer's findings inside the home dispel the reasonable belief that there is an emergency, the Fourth Amendment intrusion must come to an end. Id. ("[W]arrantless entry for emergency reasons . . . cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry."). Therefore, the question here is whether Wood had an objectively reasonable belief that an emergency existed that required immediate entry into the Hunsbergers' home to render assistance or prevent harm to persons or property within and, even if the original entry was justified, whether he continued the search after it should have been apparent that an emergency did not in fact exist. In answering that question, the Supreme Court has made clear that the Fourth Amendment inquiry is an objective one: "[a]n action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances viewed *objectively*, justify the action.' . . . . The officer's subjective motivation is irrelevant." Brigham City v. Stewart, 547 U.S. 398, 404 (2006) (emphasis in original).

Viewing the facts in the light most favorable to the Hunsbergers with the above precepts in mind, the court concludes that even if Wood's initial entry could be viewed as objectively reasonable, his findings once inside, at least before he entered the bedroom of the Hunsbergers' daughter and probably before, should have dispelled any reasonable belief that an emergency, in

12

fact, existed justifying further intrusion.[2]  Therefore, accepting the facts in the light most

favorable to the Hunsbergers, the court concludes that Wood's warrantless excursion into the

Hunsbergers' home exceeded the scope of the emergency and community caretaker doctrines

and, therefore, was impermissible.[3]

Having determined that a violation could be made out on a favorable view of the parties'

submissions, the court turns to the next sequential step of the qualified immunity analysis and

answers the question of whether the right was clearly established.  At this step the court must

---

[2] It is clear from the recording of Wood's conversation with the mothers of the teenagers, Cooper and Deane, that Wood simply suspected (and correctly so) that the Hunsbergers' home was the scene of an underage drinking party.  There is little else to suggest from the calls, or from his other actions, that he suspected anything else.  Although "[a]n action is reasonable under the Fourth Amendment regardless of the individual officers state of mind, 'as long as the circumstances, viewed objectively justify [the] action'." Brigham City v. Stuart, 547 U.S. 398, 404 (2006).  Wood's subjective belief, based as it was on objective evidence, lends some support for the proposition that a reasonable officer under the circumstances would have concluded that the Hunsbergers' home was simply the scene of an underage drinking party.  If the court were to find otherwise, the court would be finding that Wood's subjective belief was unreasonable, and that which he did not believe (that something more pernicious was afoot) would have been a more reasonable belief.

[3] In his motion for summary judgment, Wood cites a number of cases in which courts upheld warrantless entry into homes by officers.  In each of these cases, whether the court applied the emergency doctrine, caretaker doctrine, or both, exigent circumstances existed which required warrantless entry.  See United States v. Gwinn, 219 F.3d 326 (4th Cir. 2000) (officer briefly re-entered a home to retrieve shoes and clothing for arrested suspect who was shoeless in a rural area); United States v. Gillenwaters, 890 F.2d 679 (4th Cir. 1989) (officers entered a house to aid a stabbing victim because a stabbing had been reported at that house); United States v. Dart, 747 F.2d 263 (4th Cir. 1984) (a lock sawed off of a storage unit evidenced violence to the property warranting inspection of the unit); Phillips v. Peddle 7 F. App'x. 175 (4th Cir. 2001) (officer entered home to check on threatened government witness who did not answer the door); United States v. Porter, 288 F. Supp. 2d 716 (W.D. Va. 2003) (officers entered in response to a security alarm in a home where no one responded to knocking).  These warrantless entries were constitutional only insofar as they were required by the exigent circumstances.  Here, in the light most favorable to the Hunsbergers, no similar exigencies required the extensive intrusion of Wood's search.

13

determine whether the right alleged to have been violated was a "clearly established . . . right []
of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818
(1982). The inquiry is an objective one, dependent not on the subjective beliefs of the particular
officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in
those circumstances. Milstead v. Kibler, 243 F.3d 157, 161 (4th Cir. 2001). "In determining
whether a right was clearly established at the time of the claimed violation, 'courts in this circuit
[ordinarily] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and
the highest court of the state in which the case arose.'" Edwards v. City of Goldsboro, 178 F.3d
231, 251 (4th Cir.1999) (quoting Jean v. Collins, 155 F.3d 701, 709 (4th Cir. 1998) (en banc)).
The court must conduct the clearly established analysis "at a high level of particularity,"
Edwards, 178 F.3d at 251, but "the nonexistence of a case holding the defendant's identical
conduct to be unlawful does not prevent denial of qualified immunity," id., because "qualified
immunity was never intended to relieve government officials from the responsibility of applying
familiar legal principles to new situations." Trulock v. Freeh, 275 F.3d 391, 409 (4th Cir. 2001);
see also Wilson v Layne, 526 U.S. 603, 615 (1999) (holding that a right can be deemed clearly
established even if there is no prior decision addressing the precise conduct at issue, so long as its
illegality would have been evident to a reasonable officer on basis of existing caselaw). Thus,
"'clearly established' in this context includes not only already specifically adjudicated rights, but
those manifestly included within more general applications of the core constitutional principle
involved." Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992).

It is axiomatic that the exceptions to the warrant requirement are circumscribed most
closely or narrowly when a home is the subject of the intrusion, because it is there that the

14

purposes and protections of the Fourth Amendment are at their zenith. It is clearly established that "to invoke [the] so-called 'emergency doctrine,' the person making injury must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." Moss, 963 F.2d at 678. It would be neither helpful nor possible to catalog emergencies, but the cases make clear that there must be an imminent threat of serious harm, Brigham City, 547 U.S. 398 (From the backyard of a house, police observe, through a window, a fight break out inside the house where a person is punched so hard that blood sprays; this serves as exigent circumstances justifying a warrantless entry into the house); Michigan v. Tyler, 436 U.S. 499 (1942) (entry by officials to fight a fire requires no warrant); Mora v. City of Gaithersburg, 519 F.3d 216, 226 (4th Cir. 2008) (possibility of a bomb suffices as exigent circumstance permitting a warrantless search); United States v. Buckmaster, 485 F.3d 873 (6th Cir. 2007) (post-fire flooding in home created danger of electrical and structural damage, justifying warrantless entry); United States v. Uscanga-Ramirez, 475 F.3d 1024 (8th Cir. 2007) (exigent circumstances found where man locks himself in bedroom with a gun and is reportedly very upset over disintegration of marriage); United States v. Roberts, 166 F. App'x 80, 83 (4th Cir. 2006) (gunshot victim in the road and trail of blood leading into a house among the circumstances justifying warrantless entry); United States v. Kempf, 400 F.3d 501, 503 (7th Cir. 2005) (requiring objective belief that circumstances require "immediate action"), and a reasonable officer would understand that suspicion that an underage person may be drinking or attending a social occasion in another's home where others are drinking, absent other circumstances, is not an immediate threat of serious harm that permits that officer to dispense with the warrant requirement.

15

Accordingly, the court finds that, when the facts are viewed favorably to the Hunsbergers, Wood has not shown that any exception to the warrant requirement applies. That is, if those facts are true, a Fourth Amendment violation occurred, and the right violated was clearly established. Therefore, qualified immunity does not apply, and the court denies Wood's motion for summary judgment.

## B. The State Law Claims

Wood maintains that the Hunsbergers cannot prevail on their state law claims for violation of Virginia Code § 19.2-59[4] and common law trespass because his search of their home was lawful under the Fourth Amendment, and to the extent the Hunsbergers' claims are based on negligence, he is entitled to sovereign immunity. The court agrees that the Hunsbergers cannot prevail on their state law claims if Wood's search was lawful under the Fourth Amendment because § 19.2-59 provides no "greater restrictions on warrantless searches than required under the Fourth Amendment," Thims v. Commonwealth, 235 S.E.2d 443, 448 (Va. 1977), and a police officer's entry that is consistent with the Fourth Amendment is not a common law trespass. McClannan v. Chaplain, 116 S.E. 495 (Va. 1923) ("the only entry by officers which is held . . . to be unlawful is that which occurs when the officers are making an 'unreasonable'

---

[4] Virginia Code § 19.2-59 states in pertinent part:
No officer of the law or any other person shall search any place, thing or person, except by virtue of and under a warrant issued by a proper officer. Any officer or other person searching any place, thing or person otherwise than by virtue of and under a search warrant, shall be guilty of malfeasance in office. Any officer or person violating the provisions of this section shall be liable to any person aggrieved thereby in both compensatory and punitive damages. Any officer found guilty of a second offense under this section shall, upon conviction thereof, immediately forfeit his office, and such finding shall be deemed to create a vacancy in such office to be filled according to law.

16

search or seizure. Such a search or seizure is forbidden by the common law, and by the Fourth

Amendment . . . ."). But the lawfulness of Wood's search remains to be determined, and the

court does not decide at this juncture whether sovereign immunity protects him because, in

Virginia, when an agent has sovereign immunity he "is not immunized from suit. Rather, the

degree of negligence which must be shown to impose liability is elevated from simple to gross

negligence." Couplin v. Paine, 623 S.E.2d 592, 595 (Va. 2005).

### III

Claims Against Blessard

*A. The § 1983 Claim*

The Hunsbergers seek to hold Blessard liable under § 1983, as well. Blessard asserts that

he, as a private citizen not acting in concert with a government official, is not a state actor and is

therefore outside the scope of § 1983. He also argues that he is entitled to summary judgment

because he acted without malice and in good faith that his conduct was lawful. The court finds

it unnecessary to reach the question of whether Blessard acted in concert with Wood to such an

extent that he may be liable as a state actor, because the court finds no material issue of fact as to

whether he acted in good faith, which the court holds is a defense for a private party to a § 1983

claim.[5]

_____

[5]Ordinarily private persons such as Blessard do not act "under color of" law within the meaning of § 1983. However, when there is a sufficient nexus between a private party and a government party, the private party may be subject to § 1983 liability. Wyatt v. Cole, 504 U.S. 158 (1992) (reaffirming that private individuals may sometimes be subject to § 1983 liability). See, e.g., Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249 (1st Cir. 1996).

17

A government party may avoid liability by asserting qualified immunity, but private parties do not have qualified immunity. Wyatt v. Cole, 504 U.S. 158, 168 (1992). However, the Supreme Court of the United States has explicitly left open the question of whether private parties may assert a good faith defense in this context, Richardson v. McKnight, 521 U.S. 399, 413-14 (1997), and several courts of appeals have concluded that private parties do have such a defense. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir. 1994); Wyatt v. Cole, 994 F.2d 1113, 1120 (5th Cir. 1993), cert. denied, 510 U.S. 977 (1993); Duncan v. Peck, 844 F.2d 1261 (6th Cir. 1988). In Wyatt v. Cole, 994 F.2d at 1120, the Fifth Circuit defined the scope of the defense by holding that "private defendants should not be held liable under § 1983 absent a showing of malice and evidence that they either knew or should have known" that their conduct violated the Constitution. Wyatt, 994 F.2d at 1120; but see Beerman, Why Do Plaintiffs Sue Private Parties Under Section 1983, 26 Cardozo L. Rev. (Symposium) 9 (2004) ("If private individuals violate constitutional rights under color of law, the courts have no basis for creating a defense to liability, whether it is the qualified immunity that government defendants receive or some new similar good faith defense."). Other courts have required a showing of malice or a knowing violation of the law. See, e.g., Benn v. Universal Health Systems, Inc., 2001 WL 1251207 (E.D.Pa. 2001). In Jordan, 20 F.3d at 1276, the Third Circuit found that malice in this context means a "subjective appreciation" that the conduct is unconstitutional. This court follows those courts that have found good faith to be a defense for private parties unless those parties act with malice or those parties knew or should have know their actions violated the Constitution.

The court finds no genuine dispute that Blessard acted without malice. The facts, even in

18

a light most favorable to the Hunsbergers, demonstrate that Blessard was motivated solely by his desire to locate his stepdaughter. Blessard did not know the Hunsbergers (Blessard Dep. 58, 61), and his stepdaughter was not supposed to be at their home (Blessard Dep. 52). Blessard was unable to reach his stepdaughter on her cell phone, despite repeated attempts. (Blessard Dep. 59-60). Wood described Blessard as a "concerned parent" (Wood Dep. 126), and Mark Hunsberger described Blessard as "worried sick" about his stepdaughter (Mark Hunsberger Dep. 46). In his deposition Blessard said of his state of mind that night:

> I just don't understand. I don't know if I'm the only one in the dark here. I mean, I just don't understand it.
> Thoughts are starting to go through my mind now. The Police aren't really telling me anything. The cars are disappearing. My daughter is missing and nobody knows a daggone thing about it.
> You know, I'm just at a loss here.

(Blessard Dep. 67.) It is clear that Blessard's sole purpose in entering was to locate his stepdaughter.

There is also no evidence to suggest that Blessard knew or should have known that his conduct violated the Constitution. He had little of the inside information that suggested that the Hunsbergers' home was simply the scene of an underage drinking party when he arrived and Wood suggested that the two of them approach the home to find Blessard's stepdaughter (Wood Dep. 125), and he entered the home only after Wood had done so. Wood – at least tacitly, but nonetheless clearly – led the way inside as the two men conducted the search through the house. Wood's actions supported Blessard's belief that he was not violating any law in entering.

The Hunsbergers assert that because the issue is a subjective state of mind, Blessard's good faith is almost a *per se* jury issue. It is true that "where state of mind is at issue, summary

19

disposition should be sparingly used," Denny v. Seaboard Lacquer, Inc., 487 F.2d 485, 491 (4th Cir. 1973), and it is also true that direct observation of demeanor is often appropriate where credibility of witnesses is at issue. Morrison v. Nissan Co., Ltd., 601 F.2d 139, 141 (4th Cir. 1979). However, there still must be some fact from which the trier of fact reasonably could infer some other state of mind. See Conrad v. Delta Air Lines, Inc., 494 F.2d 914, 918 (7th Cir. 1974). Even the Hunsbergers recognize that "it is apparent that Blessard believed he had Wood's permission to be present in the home to look for his step-daughter." (Pl.'s Mem. in Supp. of Summ. J. 22.)   Even in the light most favorable to the Hunsbergers, nothing remotely suggests that Blessard acted with malice or that Blessard knew or should have known his actions violated the Constitution. Therefore, the court finds that Blessard acted in good faith and grants his motion for summary judgment as to the Hunsbergers' § 1983 claim.[6]

### B. The Trespass Claim

Finally, a state-law trespass claim remains pending against Blessard. Blessard moves for summary judgement of the Hunsbergers' claim for punitive damages[7], arguing that punitive damages are not appropriate because there is no evidence that Blessard acted in conscious disregard of the rights of others. In a common-law trespass suit in Virginia, "[p]unitive damages . . . may be recovered 'only where there is misconduct or actual malice, or such recklessness or

---

[6] This case is before the court on cross motions for summary judgment. Thus far, the court has considered Wood and Blessard's motions for summary judgment taking the facts of the case in the light most favorable to the Hunsbergers. Taking the facts in the light most favorable to Wood and Blessard, the court finds that there are material questions of fact for a jury to decide and denies the Hunsbergers' motion for summary judgment.

[7] The court construes Blessard's motion to dismiss this claim as a motion for summary judgment, given the factual material submitted in support of the motion.

20

negligence as to evince a conscious disregard of the rights of others.'" Hamilton Dev. Co. v. Broad Rock Club, Inc., 445 S.E.2d 140 (Va. 1994) (quoting Giant of Va., Inc. v. Pigg, 152 S.E.2d 271, 277 (Va. 1967). Here, the court already has found that Blessard acted neither with malice nor in conscious disregard of the law. Those findings apply with equal force to the Hunsbergers' trespass claim. Therefore, the court grants Blessard's motion for summary judgment as to their claim for punitive damages as to that claim.[8]

## IV

For the reasons stated, the court **DENIES** Wood's motion for summary judgment, **DENIES** the Hunsbergers' motion for summary judgment, and **GRANTS** Blessard's motion for summary judgment as to the Hunsbergers' § 1983 claim and their claim for punitive damages as to the trespass claim.

**Entered:** This 3rd day of July, 2008.

UNITED STATES DISTRICT JUDGE

---

[8] Essentially, there is no fault element in an action for trespass to land (trespass *quare clausum fregit*). See Cooper v. Horn, 448 S.E.2d 403, 407 (Va. 1994). Any *unauthorized* entry onto property which results in interference with a property owner's possessory interest is actionable. Id. However, the Hunsbergers are not entitled to recover punitive damages from Blessard, and it is difficult to conceptualize, even in the light most favorable to the Hunsbergers on the fairly extensive record before the court, a recovery of anything except nominal damages.

21